**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MAUREEN BRESNAHAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 25 C _____ |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, LT. (RET.) | ) | |
| JAMES EGAN, and SGT. THOMAS | ) | |
| COTTER, in their individual capacities, | ) | **JURY DEMAND** |
| | ) | |
| | ) | |
| Defendants. | ) | |

**<u>COMPLAINT</u>**

Plaintiff Maureen Bresnahan alleges the following against Defendants, the City of

Chicago (the "City"), Lt. (Ret.) James Egan, and Sgt. Thomas Cotter ("Cotter"):

**<u>Introduction</u>**

1.      This action arises from the City's violations of Title VII of the Civil Rights

Act ("Title VII"), the Illinois Human Rights Act ("IHRA"), the Illinois Civil Rights Act

("ICRA"), and the Equal Protection Clause, and from the individual Defendants' violations

of the Equal Protection Clause.

2.      This case is related to *Bresnahan v. City of Chicago*, No. 18 C 1974 (N.D. Ill.)

(Hunt, J.) ("*Bresnahan I*") because the two cases: (a) involve some of the same issues of fact

or law; and (b) arise out of the same transaction or occurrence in that the facts alleged in this

complaint are a continuation of the sex discrimination alleged in *Bresnahan I*, constitute

retaliation for the filing and pursuit of *Bresnahan I* and its underlying EEOC charge, and are

part of the same entrenched and unconstitutional custom or practice of sex discrimination

against women seeking promotion to or working in the Chicago Police Department's elite "Special Functions" units.

3.    In September 2025, the City withheld consent for Plaintiff to amend her *Bresnahan I* complaint, necessitating the filing of this separate action.

4.    Plaintiff challenges Defendants' relentless and continuing sex discrimination and retaliation against her for opposing that discrimination.

5.    Plaintiff further challenges the Chicago Police Department's ("CPD" or "Department") deep-seated and unconstitutional custom or practice of sex discrimination against women applying for promotion to, and employed in, prestigious units in CPD's "Special Functions" Division ("SFD"). The conduct alleged in this complaint is part of, and results from, the City's custom or practice of sex discrimination in the SFD.

6.    Plaintiff brings this action to remedy injuries resulting from events that began in or around September 2022 and continue through the present.

7.    Plaintiff also seeks declaratory, injunctive, and other equitable make-whole relief to secure future protection and to redress the past deprivation of rights secured to her under federal and state law.

## Background

8.    Plaintiff is a sworn CPD officer and an Explosives Technician on the CPD Bomb Squad. The City promoted Plaintiff to the Bomb Squad in March 2025, after she filed a charge of sex discrimination and retaliation in the Equal Employment Opportunity Commission ("EEOC").

9.    Plaintiff originally applied for a position on the Bomb Squad in 2015. At that time, the City was using unreliable, subjective, and sexually biased oral interviews to make

promotion decisions. In 2015, the City's decisionmakers rejected Plaintiff for promotion to the Bomb Squad because they believed she was "best suited" for "clerical, office" work. Plaintiff sued the City for sex discrimination in *Bresnahan I*, which remains pending.

10.     Plaintiff is not the only victim of pervasive sex discrimination in the SFD.

11.     The number of women employed in elite SFD units has been abysmal for years. Exhibit A, which is incorporated herein in its entirety, shows that the representation of women in elite SFD units—the Bomb Squad, Marine Unit, Canine Unit, Mounted Unit, and SWAT—has been and continues to be dramatically below female representation in the rest of the Department. Ex. A at 14-20. From 2008 to 2021, the highest level of female representation was only 15% of officers in these units, compared to 24% of women in the candidate pool for promotions. Figure 1 depicts the low representation of women across these jobs: Explosives Technician I, Marine Officer, Mounted Patrol Officer, Canine Handler and Explosives Detection Canine Handler, SWAT, and Helicopter Pilot:



Figure 1. Gender Representation (%) in CPD Special Functions Division by Year

3

12.     The representation of women in the SFD was even lower for certain units. For example, the Bomb Squad employed only one woman over the 14-year period from 2008 through 2021, and then only for some years:



13.     From 2008 to 2012, the unit depicted above was the Bomb and Arson Unit. After the Arson Unit was separated from the Bomb Unit, not a single woman worked on the Bomb Squad until 2018—and the woman promoted in 2018, Julie Cotter, was incessantly berated and harassed by Defendant Egan because of her sex. The next woman on the Bomb Squad, Cheryl Welbel, achieved promotion under entirely new procedures that the City validated and adopted *because* Plaintiff filed *Bresnahan I.*

14.     Until Plaintiff filed *Bresnahan I,* the City had failed—*for decades*—to validate the promotion procedures for the Bomb Squad, Marine Unit, Canine Unit, and other elite SFD units.

15.     Plaintiff's pursuit of her claims in *Bresnahan I* was an impetus for the City's validation and adoption of new selection procedures for the Bomb Squad.

4

16.     The City also validated and adopted new selection procedures for canine handler positions in direct response to the filing of *Bresnahan I*.

17.     In 2025, Plaintiff achieved promotion under the new, validated Bomb Squad procedures adopted as a result of *Bresnahan I*. However, the City delayed Plaintiff's promotion for approximately a year after she completed training because of her sex and in retaliation for her opposition to sex discrimination.

18.     Plaintiff's experience of sex discrimination in the SFD is not unique. Many other women, including, among others, Allison Schloss, Melissa Tapia, Leticia Kaner, Julie Cotter, Jean McCarthy, and Erin Garrett, have been subjected to sex-based harassment or discrimination in SFD units. Some of these women came forward as whistleblowers in *Bresnahan I*, including Julie Cotter, whom Defendant Egan victimized because of her sex.

19.     The SFD is permeated with discriminatory bias against women.

20.     In addition to her own make-whole relief, Plaintiff seeks injunctive relief to ensure equal employment opportunities for female CPD officers working in, or seeking promotion to, positions in the SFD.

<u>**Jurisdiction and Venue**</u>

21.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because at least one Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## Parties

24.    Plaintiff Maureen Bresnahan is a woman and a CPD Explosives Technician on the Bomb Squad employed by the City of Chicago.

25.    Defendant City of Chicago is, and was at all times relevant, a municipal corporation organized and existing under the laws of Illinois.

26.    The City is, and was at all times relevant, Plaintiff's "employer" as defined by Title VII and the IHRA.

27.    Defendant James Egan is a retired CPD police lieutenant and, at all times relevant, acted under color of law. He is being sued in his individual capacity.

28.    Defendant Thomas Cotter is a CPD police sergeant and, at all times relevant, acted under color of law. He is being sued in his individual capacity.

## Administrative Exhaustion

29.    Plaintiff has satisfied all administrative prerequisites to suit under Title VII and the IHRA.

30.    On January 30, 2025, Plaintiff filed a charge of sex discrimination and retaliation with the EEOC, which was cross-filed with the Illinois Department of Human Rights ("IDHR"). Plaintiff filed this complaint within 90 days after receiving her right-to-sue notices from both the U.S. Department of Justice and IDHR.

### Additional Factual Allegations Concerning the
### Discrimination and Retaliation Directed Against Plaintiff

**A.  Bomb Squad and *Bresnahan I***

31.    Plaintiff has been a sworn member of CPD since September 2005 and graduated as valedictorian of her police academy class.

6

32.     Plaintiff is currently an Explosives Technician on the Bomb Squad—a job she ultimately obtained by suing the City for sex discrimination in *Bresnahan I*, which prompted the City to validate its Bomb Squad promotion procedures and eliminate sexually biased oral interviews.

33.     Plaintiff originally applied for promotion to the Bomb Squad in 2015. At that time, the promotion process culminated in unreliable and subjective oral interviews conducted by three men: Defendant Egan, the commanding officer of the Bomb Squad; Todd Schmitt, an FBI agent and friend of Egan; and Bomb Squad officer Roland Jones.

34.     The oral interview process was not reliable and, consequently, not valid or job-related. It was not implemented in the systematic manner required to reduce the likelihood of gender or racial bias. Ex. A at 3-4, 30-41.

35.     At the consensus meeting to discuss candidates and make selection decisions, Defendant Egan, Todd Schmitt, and Roland Jones rejected Plaintiff for promotion because they believed she was "[b]est suited for clerical, office [work]." The consensus meeting notes recording the reason the interviewers rejected Plaintiff are attached as Exhibit B.

36.     Denying a woman promotion on the basis that she is "best suited" for "clerical" or "office" work constitutes sex discrimination based on sex-role stereotyping.

37.     In July 2015, after Defendant Egan and the other decisionmakers rejected Plaintiff for promotion to the Bomb Squad, Egan filed a false and malicious Internal Affairs Division ("IAD") complaint against Plaintiff, motivated by sex-based animus. IAD investigated the complaint and concluded that it was "unfounded," meaning that it was false or not factual. Egan also repeatedly harangued a state employee at the Illinois

Department of Natural Resources to have Plaintiff's explosives license revoked, which the state employee refused to do.

38.     In May 2016, Plaintiff filed a sex discrimination charge with the EEOC, alleging that the City denied her promotion to the Bomb Squad based on sex and that the City was engaged in a pattern or practice of sex discrimination against female police officers applying for promotion to SFD positions.

39.     On March 19, 2018, Plaintiff filed *Bresnahan I*, asserting sex discrimination claims against the City under Title VII and the Illinois Civil Rights Act.

40.     On May 30, 2018, Plaintiff amended her *Bresnahan I* complaint to add Egan as a Defendant and assert a *Monell* claim against the City challenging its intentional discrimination against women applying for promotion to and employed in the SFD, including the City's use of sexually biased selection procedures for the Bomb Squad and other SFD units.

41.     Beginning as early as 2016, and in direct response to Plaintiff's 2016 EEOC charge and 2018 lawsuit, the City held meetings and discussions that included the police superintendent's chief of staff, the superintendent's general counsel, at least two deputy chiefs over the SFD, the City of Chicago Department of Human Resources, and outside counsel for the City to discuss validating and replacing the promotion procedures used for the Bomb Squad and other SFD units, including eliminating oral interviews from the process.

42.     In or around 2021, the City engaged a vendor, PSI Services, to conduct a job analysis of the Explosives Technician I position and to identify and validate new promotion procedures for the Bomb Squad, Marine Unit, and Canine Unit.

43.     Plaintiff's pursuit of her claims in *Bresnahan I* was an impetus for the City to conduct a job analysis of the Explosives Technician I position and to identify and validate new promotion procedures.

44.     In or around 2021, the City eliminated the sexually biased oral interviews from the Bomb Squad promotion process.

45.     Plaintiff's pursuit of her claims in *Bresnahan I* was an impetus for the City to eliminate oral interviews from the Bomb Squad promotion process.

46.     In October 2019, human resources personnel told Defendant Egan that he could not conduct another selection process for the Bomb Squad until the process of validating the promotion procedures was completed.

47.     On information and belief, Egan knew that Plaintiff's 2016 EEOC charge and resulting sex discrimination lawsuit prompted the City to validate its Bomb Squad selection procedures and eliminate the oral interviews.

48.     On information and belief, Egan opposed eliminating oral interviews from the Bomb Squad promotion process.

49.     In 2021, despite Egan's opposition, the City implemented its new selection procedures for Explosives Technician I. The process consisted of a two-part written exam and a physical agility test—both objective procedures. Unlike the 2015 process, the 2021 Explosives Technician selection process did not include subjective oral interviews.

50.     Plaintiff reapplied for the Explosives Technician position in 2021, under the new procedures.

51.     In October 2021, Plaintiff took the new Explosives Technician written exams. When she checked in to take the exams, Egan attempted to intimidate her by walking over and hovering near her during the check-in process.

52.     Plaintiff placed in the top 12% of candidates (42/349) on the written exams and was placed on the referral/eligibility list. She also passed the physical ability test.

53.     In 2022, the City began using the new referral/eligibility list to promote officers to the Bomb Squad. Plaintiff was sent with a group of other highly ranked officers to HAZMAT Operations training in the summer of 2022. While she was there, she met Officer Cheryl Welbel, who was ranked number 1 on the list based on the new, validated, and objective selection procedures.

54.     In May 2023, the City sent Welbel to the FBI Hazardous Devices School. The City subsequently promoted Welbel to the Bomb Squad, and she became the only woman assigned to the Bomb Squad at that time.

55.     In 2023, the City offered Plaintiff a position in the next group of officers being sent to the Hazardous Devices School for Bomb Squad training. She accepted the offer and was detailed to the Bomb Squad on November 18, 2023.

56.     In December 2023, in order to accept a position on the Bomb Squad, Plaintiff was forced to surrender the explosives detection dog she had worked and lived with for almost three years.

57.     In January 2024, the City sent Plaintiff to the Redstone Arsenal in Huntsville, Alabama to complete the FBI Hazardous Devices School training course.

58.     One male officer from the group that attended HAZMAT training with Plaintiff had already been selected to attend the FBI training course with Plaintiff. However,

on information and belief, beginning as early as the fall of 2022, Defendant Egan orchestrated the assignment of a second male officer to the FBI training course. He did this to try to block or delay Plaintiff's promotion to the Bomb Squad.

59.     Egan also took additional actions to try to derail Plaintiff's promotion:

a)  In January 2024, Egan orchestrated a male officer's promotion to the Bomb Squad even though he was ineligible for the position under Department rules and regulations because he had not satisfied multiple eligibility requirements. Specifically, this officer had not completed HAZMAT Operations training, HAZMAT Technician training, a psychiatric evaluation, or a medical examination—all prerequisites for enrollment in the FBI Hazardous Devices School training course. He also had not attended or passed the FBI training course or a 30-day post-training evaluation, making him ineligible for the Explosives Technician position. Nevertheless, Egan arranged for his promotion into a vacant Bomb Squad position so that no budgeted position would remain available to promote Plaintiff after she completed the FBI training.

b)  Prior to this, in the fall of 2023, Egan called Plaintiff's lieutenant to pry for information about her on-duty injury and convince him to pressure her to relinquish her spot in the Hazardous Devices School class. This conduct violated Department rules and regulations concerning the confidentiality of medical information. Further, when he took these actions, Egan was on medical leave and prohibited from conducting Department business.

11

    c)   Plaintiff met all medical requirements for the FBI training course, and her physician signed off on her medical paperwork. Nonetheless, Egan ordered her sergeant to call and question her about her BMI or body fat percentage. Egan had no business questioning the information on a form being submitted to the FBI and did not challenge the medical qualifications of a male candidate with a larger body size.

60.    Egan took all of the above actions to expedite male officers' promotions to the Bomb Squad and block Plaintiff's promotion because of her sex and in retaliation for her 2016 EEOC charge and resulting sex discrimination claims against him and the City.

61.    In February 2024, Plaintiff graduated from the Hazardous Devices School training course.

62.    In April 2024, after Plaintiff and the two male officers successfully completed a post-training work evaluation, the City promoted the two male officers to the Bomb Squad but—once again—denied Plaintiff the promotion.

63.    This conduct was a continuation of the City's ongoing sex discrimination and retaliation against Plaintiff dating back to 2015.

64.    On January 30, 2025, Plaintiff filed a charge of sex discrimination and retaliation with the EEOC.

65.    In March 2025, after Plaintiff filed the EEOC charge, the City finally promoted her to the position of Explosives Technician I on the Bomb Squad.

**B.  Canine Handler Jobs**

66.    In 2015, Plaintiff also applied to be a Canine Handler and Explosives Detection Canine ("EDC") Handler. The selection process for these positions was similar to

the process for Explosives Technician I: a written exam, followed by a physical ability test, culminating in an oral interview.

67. Plaintiff passed the written exam and physical ability test and completed the interview, which was conducted by the canine handler interviewers, in March 2015.

68. The canine handler interviewers (one woman and two men, none of whom participated in the Bomb Squad interviews) all rated Plaintiff "recommend for hire" and ranked her 22nd on the Canine Handler eligibility list and 24th on the EDC Handler list.

69. For more than three years, from May 2017 until September 2020, the City repeatedly passed over Plaintiff on the Canine Handler and EDC Handler lists, promoting officers who were behind Plaintiff on the lists out of rank order. The City even offered the EDC Handler position to male officers who had not applied for that job, which violated Department rules and regulations.

70. In September 2020, a human resources employee contacted Plaintiff to offer her a spot in the next training class for EDC Handler, informing her that she was next on the eligibility list. That representation was false, because the City had already promoted at least seven male officers out of rank order, skipping over Plaintiff.

71. The conduct alleged above constitutes retaliation against Plaintiff for filing her 2016 EEOC and resulting *Bresnahan I* lawsuit, as well as a continuation of the relentless sex discrimination against her that began in 2015.

72. Additionally, the conduct alleged above is part of, and results from, the City's custom or practice of sex discrimination in the SFD.

73. In October 2022, Plaintiff filed internal grievances with CPD reporting this sex discrimination and retaliation.

13

**C. Sgt. Cotter's Malicious IAD Complaint**

74.     After filing her October 2022 grievance, Plaintiff was subjected to a hostile work environment based on sex and in retaliation for reporting discrimination.

75.     The hostile environment was so severe and pervasive that it altered Plaintiff's working conditions and caused her to develop Post-Traumatic Stress Disorder ("PTSD"), which her doctor has attributed to workplace bullying.

76.     The perpetrator of the hostile environment was Defendant Thomas Cotter, a CPD police sergeant who supervised Plaintiff while she worked as an EDC Handler.

77.     In November 2023, Cotter filed a false and malicious Internal Affairs Division ("IAD") complaint against Plaintiff, accusing her of failing to render aid to a civilian after Plaintiff's working dog purportedly bit the civilian. Plaintiff's working dog did not bite this individual, and Plaintiff did not fail to "render aid."

78.     Cotter's false and malicious IAD complaint exposes Plaintiff to discipline up to and including termination from the Department. Additionally, an unacceptable disciplinary record can block a CPD officer's promotion.

79.     Cotter filed the IAD complaint against Plaintiff to try to prevent her promotion to the Bomb Squad. His conduct was malicious and undertaken to punish Plaintiff for filing her grievance reporting sex discrimination in canine handler promotions.

80.     On information and belief, Cotter also sought to punish Plaintiff in retaliation for her 2016 EEOC charge and resulting *Bresnahan I* sex discrimination lawsuit, in which his ex-wife, Julie Cotter, served as a whistleblower.

81.     In addition to the malicious IAD complaint—which in and of itself constitutes severe harassment causing Plaintiff to develop PTSD—from approximately

September 2022 to November 2023, Cotter engaged in other conduct with the intent to create, and having the effect of creating, a hostile environment based on sex and retaliation. There are too many incidents to list exhaustively in a short and plain statement of the claim, but examples include:

    a) During this period, Plaintiff developed an infection and went on a short medical leave of a few days. Cotter made multiple online requests and contacted Plaintiff's home district to orchestrate four "medical checks" on her in a single day. This conduct was not required by any Department policy, is not normal for a Department supervisor, and was intended to harass and intimidate Plaintiff and to interfere with her promotion to the Bomb Squad.

    b) Cotter incessantly bad-mouthed Plaintiff to her co-workers and other supervisors, including accusing her of lying and violating Department rules and regulations.

    c) Cotter weaponized routine workplace situations and information against Plaintiff whenever possible.

    d) Cotter attempted to persuade Plaintiff's commander and lieutenant not to sign the paperwork she needed to participate in HAZMAT Technician training, which is a prerequisite to attending the FBI Hazardous Devices School.

    e) While she attended HAZMAT training, Plaintiff was entitled to overtime for the care and maintenance of her working dog. When she submitted her overtime request, Cotter denied it and wrote disparaging comments

15

explaining his denial. Cotter told Plaintiff that he had contacted others about her request, including a Canine Unit lieutenant who was not in her chain of command and the City's chief financial officer, and he also demanded her instructors' personal cell phone numbers to verify the class schedule.

f) In August 2023, Cotter called the medical section to dig for information about Plaintiff's IOD status and then emailed Plaintiff's commander and lieutenant falsely accusing her of scheduling personal medical appointments as IOD appointments and stating that her IOD appointments were not approved and that she could not go to the appointments while on duty. Cotter also falsely told the unit secretary and other front-office personnel that Plaintiff was lying about her IOD medical appointments.

g) While Plaintiff was on IOD leave in 2023, Cotter violated Department policy by calling an assistant state's attorney, sharing private medical information about Plaintiff, and stating that she would have to miss a court date because she "fell down and went boom" (or words to that effect), intending to embarrass Plaintiff for her injury and discredit her.

82. The hostile work environment created by Cotter continues to this day because, to Plaintiff's knowledge, the malicious IAD complaint remains open and unresolved.

83. Plaintiff complained about the false and malicious IAD complaint, the hostile work environment, and the retaliation in her January 2025 EEOC charge.

16

**Additional Allegations Concerning CPD's Unconstitutional
Custom or Practice of Sex Discrimination Against Women
<u>Applying to or Working In the Special Functions Division</u>**

84. Plaintiff's experiences since 2015—including, but not limited to, being rejected for the Bomb Squad as "best suited" for "clerical, office," skipped over repeatedly for canine handler positions, denied promotion—again—for the Bomb Squad in 2024, and retaliated against and subjected to a hostile work environment because of her sex and her opposition to sex discrimination, all evidence and result from the City's unconstitutional custom or practice of sex discrimination against women applying for promotion to and working in the SFD.

85. The City's hostility toward women in the prestigious SFD units is too pervasive to be unintended. The intentionality of the hostility is unmistakable given how often and thoroughly it manifests itself. Both alone and together, the following examples lead almost inexorably to the conclusion that the City is now, and for years has been, intentionally deterring and preventing fully qualified women from enjoying equal employment opportunities in the SFD. These acts and omissions cannot plausibly be explained except as a pattern, practice, or custom of intentional sex discrimination:

a) The City has a long history of excluding women from the SFD. The representation of women in the elite units of the SFD over the years has been and continues to be dramatically below the representation of women in the Department and in the candidate pool for SFD positions. The data set forth in paragraphs 11-12 above and in Exhibit A (pages 14-20) evidence systemic and continuing discrimination against women in the most prestigious and sought-after SFD units.

17

b) The City also has a long and persistent history of excluding women from SFD command positions. The experience of Lt. (Ret.) Allison Schloss exemplifies the deep-seated bias against women serving as commanding officers in the SFD. The City is aware of the problem but has taken inadequate, if any, steps to remedy it.

c) For years, the City's sexually biased selection procedures for the Bomb Squad and other SFD units included the use of subjective, non-blinded, and unreliable oral interviews. Exhibit A at 1-6, 20-52. Such procedures allowed discriminatory animus, gender bias, and gender stereotyping to taint selections.

d) From at least 1992 until 2021, none of the elements of the selection processes used for any position in any unit of the SFD were validated for job-relatedness either internally or externally. Until December 2016, the deputy chief over Special Functions, Steve Georgas, had never discussed with anyone the need to validate SFD's selection processes, and when he did, it was in direct response to Plaintiff's EEOC charge challenging the Bomb Squad selection process.

e) For years, high-level CPD brass—including at least Georgas, one other deputy chief, and CPD's chief of patrol—knew there were few women working in SFD units. However, until Plaintiff filed her 2016 EEOC charge and resulting lawsuit, the City took no measures to eliminate gender bias from or validate the promotions procedures for these units.

18

f) To this day, the City has failed to validate tests and other measures used to terminate women from assignments in the SFD, enabling supervisors to discriminate against and harass women, as evidenced by the treatment of Sgt. Melissa Tapia.

g) The City has allowed supervisors in SFD units to harass, humiliate, undermine, and discourage women who have managed to overcome the obstacles and get promoted to SFD positions. Examples include but are not limited to Plaintiff, Allison Schloss, Melissa Tapia, Julie Cotter, Leticia Kaner, Jean McCarthy, and Erin Garrett.

h) The City has allowed supervisors in SFD units to file or instigate the filing of false and malicious Internal Affairs Divisions complaints against women to drive them out of or prevent them from entering SFD units. The victims of this conduct include at least Plaintiff and Allison Schloss.

86. The City is well aware of the sorts of measures that can and should be taken to reduce or eliminate bias. For example, for promotions to the positions of detective, sergeant, and lieutenant, the City "blinds" the written exam sheets by removing the candidates' names.

87. Yet despite awareness of both the custom or practice of sex discrimination in the SFD and the measures that could be taken to reduce or eliminate bias, the City failed to take corrective action until Plaintiff filed her 2016 EEOC charge and sued the City, allowing the unconstitutional custom or practice of discrimination against women to persist.

88. Unless restrained by the Court, the City will continue to employ policies and practices that discriminate against women seeking promotion to or employed in SFD units.

**FIRST CLAIM FOR RELIEF**
**Title VII, 42 U.S.C. § 2000e-2**
**Sex Discrimination**
**(Against the City of Chicago)**

89.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

90.    Defendant intentionally discriminated against Plaintiff by failing to promote her to Bomb Squad in April 2024 because of her sex.

91.    As a direct and proximate result, she has suffered injuries including but not limited to the loss of income and training opportunities, damage to her reputation, and emotional distress.

**SECOND CLAIM FOR RELIEF**
**Illinois Human Rights Act, 775 ILCS 5/2-102(A)**
**Sex Discrimination**
**(Against the City of Chicago)**

92.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

93.    Defendant intentionally discriminated against Plaintiff by failing to promote her to Bomb Squad in April 2024 because of her sex.

94.    As a direct and proximate result, Plaintiff has suffered injuries including but not limited to the loss of income and training opportunities, damage to her reputation, and emotional distress.

**THIRD CLAIM FOR RELIEF**
**Illinois Civil Rights Act, 740 ILCS 23/5**
**Sex Discrimination**
**(Against the City of Chicago)**

95.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

96.    740 ILCS 23/5(a) provides, "No unit of State, county, or local government in Illinois shall: (1) exclude a person from participation in, deny a person the benefits of, or

subject a person to discrimination under any program or activity on the grounds of that person's race, color, national origin, or gender[.]"

97.     By failing to promote Plaintiff to the Bomb Squad in 2024, Defendant subjected her to discrimination on the basis of her gender, in violation of 740 ILCS 23/5(a).

98.     As a direct and proximate result, Plaintiff has suffered damages including but not limited to the loss of income and training opportunities, damage to her reputation, and emotional distress.

**FOURTH CLAIM FOR RELIEF**
**Title VII, 42 U.S.C. § 2000e-3(a)**
**Retaliation**
**(Against the City of Chicago)**

99.     Plaintiff incorporates by reference the preceding paragraphs as alleged above.

100.    Through the actions described above, from April 2024 and continuing to the present, Defendant retaliated against Plaintiff for filing her 2016 EEOC charge and for filing and pursuing her post-charge 2018 lawsuit.

101.    Additionally, through the actions described above, from April 2024 and continuing to the present, Defendant retaliated against Plaintiff for filing her October 2022 grievance reporting sex discrimination.

102.    As a direct and proximate result, Plaintiff has suffered injuries including but not limited to the loss of income and training opportunities, damage to her reputation, and emotional distress.

**FIFTH CLAIM FOR RELIEF**
**Illinois Human Rights Act, 775 ILCS 5/6-101**
**Retaliation**
**(Against the City of Chicago)**

103.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

21

104. Through the actions described above, from April 2024 and continuing to the present, Defendant retaliated against Plaintiff for filing her October 2022 grievance reporting sex discrimination.

105. As a direct and proximate result, Plaintiff has suffered injuries including but not limited to the loss of income and training opportunities, damage to her reputation, and emotional distress.

**SIXTH CLAIM FOR RELIEF**
**Illinois Civil Rights Act, 740 ILCS 23/5**
**Retaliation**
**(Against the City of Chicago)**

106. Plaintiff incorporates by reference the preceding paragraphs as alleged above.

107. Through the actions described above, Defendant retaliated against Plaintiff for filing and pursuing her 2018 lawsuit.

108. Additionally, through the actions described above, Defendant retaliated against Plaintiff for filing her October 2022 grievance reporting sex discrimination.

109. With respect to the actions described above, Plaintiff seeks relief for conduct she discovered within two years of the filing of this complaint.

110. As a direct and proximate result, Plaintiff has suffered injuries including but not limited to the loss of income and training opportunities, damage to her reputation, and emotional distress.

**SEVENTH CLAIM FOR RELIEF**
**Title VII, 42 U.S.C. § 2000e-2**
**Hostile Environment**
**(Against the City of Chicago)**

111. Plaintiff incorporates by reference the preceding paragraphs as alleged above.

112.    Through the actions described above, from in or around September 2022 and continuing to the present, the City created and maintained a sexually hostile work environment that was sufficiently severe or pervasive that it altered the conditions of Plaintiff's employment and created a work environment that a reasonable person in Plaintiff's position would find hostile, and that Plaintiff did in fact experience as hostile and abusive.

113.    As a direct and proximate result, Plaintiff has suffered injuries including but not limited to physical injury (Post-Traumatic Stress Disorder) and other damages.

**EIGHTH CLAIM FOR RELIEF**
**Illinois Human Rights Act, 775 ILCS 5/2-102(A)**
**Hostile Environment**
**(Against the City of Chicago)**

114.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

115.    Through the actions described above, from in or around September 2022 and continuing to the present, the City created and maintained a sexually hostile work environment that was sufficiently severe or pervasive that it altered the conditions of Plaintiff's employment and created a work environment that a reasonable person in Plaintiff's position would find hostile, and that Plaintiff did in fact experience as hostile and abusive.

116.    As a direct and proximate result, Plaintiff has suffered injuries including but not limited to physical injury (Post-Traumatic Stress Disorder) and other damages.

## NINTH CLAIM FOR RELIEF
### Illinois Civil Rights Act, 740 ILCS 23/5
### Hostile Environment
### (Against the City of Chicago)

117.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

118.    740 ILCS 23/5(a) provides, "No unit of State, county, or local government in Illinois shall: (1) exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's race, color, national origin, or gender[.]"

119.    Through the actions described above, from in or around September 2022 and continuing to the present, the City created and maintained a sexually hostile work environment that was sufficiently severe or pervasive that it altered the conditions of Plaintiff's employment and created a work environment that a reasonable person in Plaintiff's position would find hostile, and that Plaintiff did in fact experience as hostile and abusive.

120.    As a direct and proximate result, Plaintiff has suffered injuries including but not limited to physical injury (Post-Traumatic Stress Disorder) and other damages.

## TENTH CLAIM FOR RELIEF
### Equal Protection – 42 U.S.C. § 1983 (*Monell*)
### (Against the City of Chicago)

121.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

122.    At all times relevant, the City of Chicago has acted under color of law.

123.    The City's intentional sex discrimination against Plaintiff and other women applying for positions and employed in the Special Functions Division has been so

widespread and well-settled as to constitute a standard operating procedure of the City, the *de facto* equivalent of a formal policy of sex discrimination with the force of law.

124.    As a direct and proximate result, Plaintiff has suffered injuries including but not limited to the loss of income and training opportunities, damage to her reputation, physical injury (Post-Traumatic Stress Disorder), and emotional distress.

## ELEVENTH CLAIM FOR RELIEF
### Equal Protection – 42 U.S.C. § 1983
### (Against Defendant Egan)

125.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

126.    At all times relevant, Defendant Egan acted under color of law.

127.    Through the actions described above, Defendant Egan intentionally discriminated against Plaintiff on the basis of sex in violation of her equal protection rights.

128.    With respect to the actions described above, Plaintiff seeks relief for conduct she discovered within two years of the filing of this complaint.

129.    As a direct and proximate result, Plaintiff has suffered injuries including but not limited to the loss of income and training opportunities, damage to her reputation, and emotional distress.

## TWELFTH CLAIM FOR RELIEF
### Equal Protection – 42 U.S.C. § 1983
### (Against Defendant Cotter)

130.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

131.    At all times relevant, Defendant Cotter acted under color of law.

132.    Through the actions described above, from in or around September 2022 and continuing to the present, Defendant Cotter intentionally discriminated against Plaintiff on

the basis of sex by creating a hostile work environment that was sufficiently severe or pervasive that it altered the conditions of her employment.

133.    As a direct and proximate result, Plaintiff has suffered injuries including but not limited to physical injury (Post-Traumatic Stress Disorder) and other damages.

## INDEMNIFICATION
### (Against the City of Chicago)

134.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

135.    Because Egan and Cotter were acting within the scope of their employment with the City, the City of Chicago is responsible under 745 ILCS 10/9-102 to indemnify them for compensatory damages and may also pay any associated attorney's fees and costs for which they are liable to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A.    Declare that the City has engaged in a policy, custom, or practice that deprived Plaintiff of rights protected by Title VII, the Illinois Human Rights Act, the Illinois Civil Rights Act, and the Equal Protection Clause;

B.    Order the City to adopt and implement policies, procedures, and practices that will curtail discrimination against women in the Special Functions Division, including but not limited to by implementing job-related selection procedures and validating all tests or other standards used as a condition of continued employment in SFD units and by conducting mandatory training of all SFD supervisory personnel;

C.    Order the City to take all necessary and appropriate measures to protect Plaintiff from retaliation;

D.      Appoint a monitor to oversee and ensure the City's compliance with Title VII, the Illinois Human Rights Act, the Illinois Civil Rights Act, and the Equal Protection Clause with respect to the Special Functions Division;

E.      Award Plaintiff backpay, compensatory damages, and other make-whole legal and equitable relief;

F.      Declare that Defendants Egan and Cotter have deprived Plaintiff of rights protected by the Fourteenth Amendment;

G.      Order Egan and Cotter to pay punitive damages;

H.      Order the City to indemnify Egan and Cotter for compensatory damages awarded against them;

I.      Declare that Plaintiff is a prevailing party by obtaining some of her requested relief through a judicial judgment in her favor or through any settlement agreement approved by the court, or because Plaintiff's pursuit of a non-frivolous claim was a catalyst for a unilateral change in position by the City relative to the relief sought;

J.      Award Plaintiff her reasonable attorneys' fees, costs, and expenses, including expert witness fees and other litigation expenses;

K.      Award Plaintiff pre-judgment and post-judgment interest; and

L.      Order all other appropriate relief as the interests of justice may require.

## JURY DEMAND

Plaintiff demands a jury trial on all jury issues.

Dated: December 18, 2025                    By: /s/ Marni Willenson_____
                                            One of the Attorneys for Plaintiff

27

Marni Willenson
WILLENSON LAW, LLC
3420 W. Armitage Ave., Ste. 200
Chicago, IL 60618
(312) 508-5380
marni@willensonlaw.com

C. Philip Curley
Robert L. Margolis
ROBINSON CURLEY, P.C.
300 S. Wacker Dr., Ste. 1700
Chicago, IL 60606
(312) 663-3100
pcurley@robinsoncurley.com
rmargolis@robinsoncurley.com

Attorneys for Plaintiffs